**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MATTHEW LICHTENSTEIN<br><br>     v.<br><br>LOWER MERION SCHOOL DISTRICT, et al. | CIVIL ACTION<br><br>NO.  16-5366 |

Baylson, J.                                                          February 8, 2017

<u>**MEMORANDUM RE: DEFENDANTS' MOTION TO DISMISS**</u>

## I.      Introduction

Plaintiff Matthew Lichtenstein ("Plaintiff") brings this action against defendants Lower Merion School District ("Lower Merion"), Pat Guinnane, the Director of Operations for Lower Merion ("Guinnane"), Ryan Sankey, an employee at Lower Merion High School ("Sankey"), and Frank Agostini, also an employee at Lower Merion High School ("Agostini," and collectively, "Defendants"), alleging violations of his rights pursuant to the Due Process Clause of the Fourteenth Amendment of the Constitution.

Plaintiff's Complaint (ECF 1, "Compl.") alleges three Counts:

(1) a claim for violation of the Fourteenth Amendment under 42 U.S.C. §1983 based on the "special relationship" exception (Compl. ¶¶ 58-62);

(2) a claim for violation of the Fourteenth Amendment under 42 U.S.C. § 1983 based on the "state-created danger" exception (<u>Id</u>. ¶¶ 63-70);

(3) a <u>Monell</u> claim under 42 U.S.C. § 1983 against Lower Merion.  (<u>Id</u>. ¶¶ 71-76).

On November 22, 2016, Defendants moved to dismiss the Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), (ECF 8, "Defs.' Mot."), to which Plaintiff filed an Opposition on December 6, 2016, (ECF 9, "Pl.'s Opp'n").  Defendants did not file a reply brief.

For the following reasons, Defendants' Motion will be DENIED, except as to all claims against Guinnane, where it will be GRANTED, without prejudice, and with leave to amend.

**II.      Factual Background**

Plaintiff is a twenty-two year old man who has been multiply handicapped since birth, and has required the use of a wheelchair since childhood.  Plaintiff grew up in Lower Merion Township, and was attending Lower Merion High School when, on October 16, 2014, the accident at issue in this case occurred.  (Compl. ¶ 14).

Due to his multiple disabilities, while a student at Lower Merion, Plaintiff was eligible for special education services pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et. seq. ("IDEA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504").  (Id. ¶ 15).  Plaintiff's special education was provided pursuant to Individualized Education Programs ("IEPs").  (Id. ¶ 18).  During the 2014-2015 schoolyear, Plaintiff's governing IEP provided that he take swimming lessons, and that, while swimming, he would be assisted by two "1:1 assistants."  (Id. ¶¶ 18-19).  Sankey and Agostini were Plaintiff's 1:1 assistant and, pursuant to the IDEA and Section 504, were required to be instructed in caring for Plaintiff.  (Id. ¶ 20).

Plaintiff alleges that he was "dependent on [Lower Merion] for his most basic human needs, i.e. medical care, safety, toileting, and the completion of the activities of daily living." (Id. ¶ 16).  Since beginning to swim in the Lower Merion pool during the 2013-2014 school year, Plaintiff was transported into and out of the pool using a chair (the "Chair") that Defendants referred to as a "pool chair," but that was actually a "shower chair/commode chair," and that was not designed to transfer special needs students.  (Id. ¶¶ 28-29).  According to Plaintiff, despite

knowing that the Chair was "decrepit," Sankey and Agostini frequently used the Chair to transport Plaintiff.  (Id. ¶¶ 35-36)

On October 16, 2014, Sankey and Agostini transported Plaintiff to and from the pool in the Chair.  (Id. ¶¶ 41-42).  While wheeling Plaintiff back to the locker room after his swimming lesson, the Chair broke.  (Id. ¶ 44).  Either Sankey or Agostini "grabbed [Plaintiff] in order to keep him from falling onto the" pool deck.  (Id.).  According to Plaintiff, Sankey and Agostini were not properly trained to support Plaintiff once the chair broke, and he "was handled roughly which caused serious and permanent physical injury" to, *inter alia,* his "back, neck, [and] upper extremities."  (Id. ¶¶ 46-47, 50, 53).

Plaintiff alleges that Defendants knew that the Chair "was not being used for its intended purpose."  (Id. ¶ 69b).  Additionally, the Chair "was in deplorable condition" in that it (1) "had been used for numerous years, and was long past its useful/safe life"; (2) "had been previously broken and was held together in numerous places by tape"; and (3) "was unstable and was held together in numerous places with tape."  (Id. ¶ 30).  Plaintiff alleges that Defendants "willfully and consciously ignored the risks and dangers inherent in repeatedly placing [Plaintiff] into" the Chair.  (Id. ¶ 32).  Plaintiff asserts that his injuries were "easily avoidable" because Defendants could have "replaced the decrepit" Chair, "use[d] a proper lift" to transport Plaintiff, or properly trained Sankey and Agostini to deal with an emergency situation involving Plaintiff.  (Id. ¶ 67).  Shortly after the incident, Defendants replaced the Chair.  (Id. ¶ 31).

### III.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations that "state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A complaint will

satisfy this threshold test for facial plausibility if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. While all factual allegations must be accepted as true, Erickson v. Pardus, 551 U.S. 89, 94 (2007), this requirement does not apply to legal conclusions, which may be disregarded, Iqbal, 556 U.S. at 678.

When presented with a motion to dismiss under Rule 12(b)(6), a district court should conduct a two-part analysis. First, it should separate the factual and legal elements of a claim and accept all of the well-pleaded facts as true. Second, it should determine whether the factual allegations are sufficient to show that the plaintiff has a "plausible claim for relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

## IV.  Discussion

"To establish a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate a violation of a right protected by the Constitution or laws of the United Sates that was committed by a person acting under the color of state law." Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (en banc) (citing Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996)). "The first step in evaluating a Section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all." Id. (quoting Cty. Of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998)).

Generally, "the due process clause does not impose an affirmative duty upon the state to protect citizens from the acts of private individuals." Sanford v. Siles, 456 F.3d 298, 303-04 (3d Cir. 2006). However, the third circuit has recognized two narrow exceptions to that general rule:

"[f]irst, the state has a duty to protect or care for individuals when a 'special relationship' exists"; "[s]econd the state has a duty when a 'state-created danger' is involved." Id. (citing Morse v. Lower Merion School Dist., 132 F.3d 902, 907 (3d Cir. 1997)).

Defendants' Motion to Dismiss characterizes Counts One and Two as bringing "*a substantive due process/state created danger claim.*"  (Defs.' Mot. at 2 (emphasis added)). Defendants' Motion does not directly contest the adequacy of Plaintiff's allegations with respect to his "special relationship" claim, and instead argues that "[t]he entirety of Count I of the Complaint is designed to establish, factually, that Plaintiff and [D]efendants have a 'special relationship' as required for a state-created danger claim," which is "not in dispute." Accordingly, Defendants argue that "Count I is duplicative of Count II."  (Defs.' Mot. at 9). Plaintiff argues that he should be permitted to pursue his claims because he has adequately alleged each of the recognized exceptions.

We discuss each claim in turn.

## A.  Special Relationship Exception (Count One)

### a.  Applicable Law

The "special relationship" exception allows a plaintiff to recover when the state enters into a special relationship with a citizen and "fails to protect the health and safety of the citizen to whom it owes an affirmative duty."  D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1369 (3d Cir. 1992).

The "special relationship" exception was first recognized in Deshaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 200 (1989), where the Supreme Court explained that, "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, *or other similar restraints of personal*

*liberty*—which is the 'deprivation of liberty' triggering the protections of the Due Process

Clause, not its failure to act to protect his liberty interests against harms inflicted by other

means." Id. (emphasis added).  Since Deshaney, the Supreme Court has extended this exception

to incarcerated individuals, see Estelle v. Gamble, 429 U.S. 97 (1976), and involuntarily

committed mental patients, see Youngberg v. Romeo, 457 U.S. 307 (1982), and the Third Circuit

has extended it to foster children, see Morra, 212 F.3d at 801.

      The Third Circuit took up the issue of whether the special relationship exception should

be extended in the public school district context in Middle Bucks, 972 F.2d at 1369.  There, two

female students alleged that they had been verbally and sexually molested by male students in an

art class.  They argued that, under Deshaney, the special relationship exception should apply

because their relationship with the school was a type of "restraint[] of personal liberty" that was

analogous to the custodial relationships where the exception had been conclusively recognized.

The court held, however, that the "type of custody referred to by the Court in Deshaney . . . [wa]s

to be sharply contrasted with [the plaintiff's] situation." Id.  Specifically, it explained,

> "[t]he state's duty to prisoners and involuntarily committed
> patients exists because of the full time severe and continuous state
> restrictions of liberty in both environments.  Institutionalized
> persons are wholly dependent upon the state for food, shelter,
> clothing and safety.  It is not within their power to provide for
> themselves, nor are they given the opportunity to seek outside help
> to meet basic needs.  Obviously, they are not free to leave."

Id. at 1371.  The Third Circuit rejected the plaintiff's argument that the school's authority over

the plaintiffs during the school day, or the fact that state law compels their attendance, brings

them within the exception because "students . . . do not depend upon the schools to provide for

their basic human needs . . . even during the school day . . . parents or others remain a child's

primary caretakers and decisionmakers." Id. at 1372.

Then, in <u>Morrow v. Balaski</u>, 719 U.S. F.3d 160 (3d Cir. 2013), citing *dictum* in <u>Vernonia School District 47J v. Acton</u>, 515 U.S. 646 (1995),[1] the Third Circuit officially rejected the notion that "public schools *as a general matter* have such a degree of control over children as to give rise to a constitutional 'duty to protect'" them from private actors.  <u>Id.</u> (citing <u>DeShaney</u>, 489 U.S. at 200) (emphasis added).  The Third Circuit, however, left the door for such claims slightly adjar.  The court explained,

> [W]e do not foreclose the possibility of a special relationship arising between a *particular* school and a *particular* student under certain unique and narrow circumstances.  However, any such circumstances must be so significant as to forge a different kind of relationship between a student and a school than that which is inherent in the discretion afforded school administration as part of the schools' . . . compulsory attendance laws.

<u>Id.</u> (emphasis in original).

In reaching its conclusion, the court reiterated the rationale articulated in <u>Middle Bucks</u> that, "unlike children in foster care, students in public schools continue to be primarily dependent on their parents for their care and protection, not on their school."  That is, "the restrictions that schools place on students generally, and the specific restrictions alleged here, are different in kind from the restrictions faced by the prisoners at issue in <u>Estelle</u> or institutionalized persons in <u>Youngberg</u>."  <u>Id.</u> (internal citations omitted).

**b. Application**

As stated above, Defendants argue that Count One, alleging the "special relationship exception" duplicates Count Two, alleging the state-created danger exception, because "[t]he entirety of Count I of the Complaint is designed to establish, factually, that Plaintiff and

---

[1]       In <u>Vernonia</u>, the Supreme Court stated, "[W]e do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional 'duty to protect.'"  515 U.S. at 655.

[D]efendants have a 'special relationship' as required for a state-created danger claim." (Defs.' Mot. at 9). In making this argument, however, Defendants improperly conflate Count One and Count Two of the Complaint. [2]

Plaintiff argues that he properly alleged a "special" relationship claim because he "pled in his Complaint that he was totally dependent upon Lower Merion for his most basic needs in the school setting." (Pl.'s Opp'n at 9 (citing Compl. ¶ 16 ("When [Plaintiff] attended school he was unable to care for himself, and was dependent on the Lower Merion School District for his most basic human needs, i.e. medical care, safety, toileting, and the completion of the activities of daily life."))). Plaintiff also alleges that "Defendants do not deny that [Plaintiff] properly pled a 'special relationship' claim in Count I of his Complaint." [3] (Id.).

As discussed above, the Third Circuit in Morrow left open the possibility that under "certain unique and narrow circumstances," a special relationship may "aris[e] between a *particular* school and *particular* students." 719 F.3d at 170 (emphasis in original). Plaintiff has done this. Plaintiff has alleged that, due to his severe physical limitations, he is so "wholly dependent" on Defendants for his safety and well-being while being transported in the Chair that

---

[2] In Phillips v. County of Allegheny, 515 F.3d 224, 242 (3d Cir. 2008), the Third Circuit recognized, and explained, the difference between the "special relationship" *element* of a "state-created danger" claim, and the constitutional *claim* known as the "special relationship" exception as follows: "while the state created danger analysis requires that some relationship exist between the state and the plaintiff. . . [t]o adequately allege such a relationship, a plaintiff need not plead facts that show the same 'special relationship' basis for constitutional liability. Instead, the relationship requirement of the third element 'contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense. The relationship that can be established between the state and the plaintiff can be 'merely' that the plaintiff was a foreseeable victim, individually or as a member of a distinct class." Id.
[3] In actuality, Defendants conceded that Plaintiff had alleged the "special relationship" *element* of the "state-created danger" exception, not that he had adequately alleged a "special relationship" claim, which is subject to a different constitutional test.

8

the restrictions he faces are not "different in kind" from the restrictions faced by those in an institutional or custodial setting.

The Court recognizes that the "kind" and extent of Plaintiff's dependence on Defendants while being transported in the Chair is not imposed on him by the State.  That is, Plaintiff is a prisoner to his own body, not one of the State.  But while this nuance may be relevant at some later stage, there is no binding authority that requires this Court to reject Plaintiff's allegations as insufficient to state a claim as a matter of law.  As explained more fully above, courts rejecting "special relationship" claims in the public school context have consistently done so based on the extent of—as opposed to the reason for—the plaintiff's dependence on the school district. Plaintiff has adequately alleged that the extent of his dependence on the Defendants, while being transported in the Chair, was at least as high as the extent of, *e.g.*, an inmate's dependence in prison.  Accordingly, the Court may reasonable draw the inference that his claim comes within the "unique and narrow circumstances" required to successfully state a "special relationship" claim.

## B.  State-Created Danger (Count Two)

### a.  Applicable Law

In <u>Kniepp v. Tedder</u>, 95 F.3d 1199, 1201 (3d Cir. 1996), the Third Circuit first adopted the state created danger theory as a mechanism by which plaintiffs may establish constitutional violations, under Section 1983, if an individual incurs harm as a direct result of certain state actions.  In other words, "liability may attach where the state acts to *create* or *enhance* a danger that deprives a plaintiff of his or her Fourteenth Amendment rights to substantive due process." <u>Morrow</u>, 719 F.3d at 177 (emphasis in original).

9

In <u>Bright v. Westmoreland County</u>, 443 F.3d 276 (3d Cir. 2006), the Third Circuit articulated the following four-factor test to determine whether a plaintiff has stated a claim under the state-created danger exception:

(1) The harm ultimately caused was foreseeable and fairly direct;
(2) A state actor acted with a degree of culpability that shocks the conscience;
(3) A relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
(4) A state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

<u>Id</u>. at 281.

> **b.  Application**

Defendants concede that Plaintiff has sufficiently alleged the third element (special relationship) of the state created danger claim, but argue that Plaintiff has failed "to establish three of the four elements of a state-created danger claim." (Defs.' Mot. at 7-10).

The Court will consider the sufficiency of Plaintiff's allegations with respect to each element of the claim.

> **i.  Foreseeability and Directness**

To satisfy the first element of his state-created danger claim, Plaintiff must allege facts to plausibly show that the harm he suffered was a "foreseeable and fairly direct" consequence of Defendants' actions.  <u>Bright</u>, 443 F.3d at 281.

To make out the foreseeability element, "the plaintiff must only 'allege an awareness on the part of the state actors that rises to the level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm.'"  <u>L.R. v. School District of Philadelphia</u>, 836 F.3d 235 (3d Cir. 2016) (quoting <u>Phillips</u>, 515 F.3d at 238).  It can be

sufficient to allege facts that "ordinary common sense and experience [would] sufficiently inform[] the [defendant] of the foreseeability of the harm to the [plaintiff]." Phillips, 515 F.3d 224 (2008) (citing Kneipp, 95 F.3d 1199). For instance, in L.R., it was "foreseeable that releasing a young child to a stranger could result in harm to the child." 836 F.3d at 245. Similarly, in Kneipp, it was foreseeable that leaving an intoxicated woman alone outside late at night would result in harm to the woman. See Kneipp, 95 F.3d at 1208.

Defendants argue that Plaintiff has failed to adequately allege the foreseeability element of the state-created danger exception because the fact that the chair "function[ed] as intended" for 2 years prior to its collapse "establish[es] the foreseeability of no such harm, as the equipment functioned as required on all previous occasions." (Defs.' Mot. at 7).

Plaintiff, for his part, argues that Defendants' decision to transport Plaintiff in the Chair, when its unsafe nature was "readily apparent," created a foreseeable risk that Plaintiff would suffer harm. (Pl.'s Opp'n at 10).

The Court agrees. Plaintiff has adequately alleged that the harm he suffered was foreseeable. Plaintiff alleges that Defendants used the Chair to transport Plaintiff in and out of the pool, even though they knew that it (1) "was in deplorable condition"; (2) "had been used for numerous years and . . . was long past its useful/safe life"; (3) "had been previously broken and was held together in numerous places by tape"; and (4) "was unstable and was held together in numerous places with tape." (Compl. ¶¶ 59e-h). Given Plaintiff's obviously fragile state, "ordinary common sense and experience [would] sufficiently inform[] the [defendant] of the foreseeability of the harm to[Plaintiff]." Kniepp, 95 F.3d at 1208. The fact that use of the Chair had not previously led to the harm Plaintiff suffered on October 16, 2014 does not change the foreseeability of the harm. As Plaintiff alleges, the fact that the Chair was taped together permits

the inference that the Chair had previously broken.  Moreover, the fact that its use had not *previously* injured Plaintiff was fortunate, but not liability-absolving.

Satisfying the requirement of foreseeability, however, "does not end the analysis."  Henry v. City of Erie, 728 F.3d 275, 283 (3d Cir. 2013).  To satisfy the "fairly direct" requirement, a plaintiff "must plausibly allege that state officials' actions 'precipitated or w[ere] the catalyst for' the harm for which the plaintiff brings suit."  Id. at 285 (alterations in original).  The element will not be satisfied if the connection between the state actor's actions and the incurred harm is "too attenuated . . . to support liability," or is separated by intervening causes.  Morse, 132 F.3d at 908.

Plaintiff has also adequately alleged the "fairly direct" requirement of the element, since the Defendants' action of transporting Plaintiff in the Chair was the direct cause of the injury he suffered on October 14, 2016.

Accordingly, Plaintiff has adequately alleged the foreseeability element.

### ii.  Shock the Conscience

The second element of the state created danger claim requires a plaintiff to sufficiently plead facts to establish that "a state actor acted with a degree of culpability that shocks the conscience."  Bright, 443 F.3d at 281.  Generally, "the standard of culpability in substantive due process cases . . . is difficult to discern."  Sanford v. Stiles, 456 F.3d 298, 305 (3d Cir. 2006).  Practically speaking, "the measure of what [action] is conscience shocking is no calibrated yard stick' . . . and has an 'elusive' quality to it."  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 425 (3d Cir. 2006) (internal citations omitted).  Yet, the shock the conscience standard encompasses "only the most egregious official conduct."  United Artists Theater Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 400 (3d Cir. 2003) (quoting Lewis, 523 U.S. at 846)).  As such, "negligent behavior can never rise to the level of conscience shocking."  Bucks, 455 F.3d at 426.

In <u>Stiles</u>, the Third Circuit clarified "the standard of fault in state-created danger cases." 456 F.3d at 305.  As the court explained, "[i]n any state-created danger cases, the state actor's behavior must always shock the conscience. But what is required to meet the conscience-shocking level will depend upon the circumstances of each case, particularly the extent to which deliberation is possible."  Establishing what has become known as a "spectrum of culpable conduct," <u>Kaucher</u>, 455 F.3d at 426, the <u>Stiles</u> court elaborated as follows:

> The level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases.  In a hyperpressurized environment, an intent to cause harm is usually required.  On the other hand, in cases where deliberation is possible and officials have the time to make unhurried judgments, deliberate indifference is sufficient. . . . deliberate indifference might exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known.

<u>Id</u>.

Defendants argue that their behavior did not shock the conscience because "[f]or the two-year period prior to his injury, the chair functioned exactly as it should, and no harm came to plaintiff."  (Defs.' Mot. at 8).  Defendant concedes that "[h]ad the Defendants continued to use the broken chair to transport the Plaintiff, the argument might be different."  (<u>Id</u>.).

Plaintiff argues that he need only plausibly allege that Defendants were deliberately indifferent to his plight because Defendants' decision to make swimming a part of his IEP was not a "hyperpressurized situation."  (Pl.'s Opp'n at 12).  Rather, Defendants had "all the time in the world to make a reasoned decision to prevent [Plaintiff's] injury" i.e., to replace the Chair. (<u>Id</u>.)  Plaintiff argues that he has adequately alleged that Defendants were deliberately indifferent to his plight "by placing [him], an individual they knew had serious orthopedic injuries, into [the Chair] which they knew was decrepit, or which was obviously decrepit."  (<u>Id</u>.).

13

The Court agrees that Plaintiff's Complaint adequately alleges the lowest standard of conscious-shocking conduct, deliberate indifference.  As stated above, Plaintiff alleges that Defendants were aware of the Chair's poor condition, and of the harm that could result to Plaintiff if it were to break, so their continued use of the Chair could constitute deliberate indifference to that risk.  Importantly, Defendants concede that "[h]ad the Defendants continued to use the broken chair to transport the Plaintiff [after it had broken], the argument might be different."  (Def.'s Mot. at 8; see Pl.'s Opp'n at 12).  As Plaintiff notes in his brief, the Complaint, in fact, alleges that the Chair had previously broken.  (Compl. ¶ 59g ("[Defendants] placed [Plaintiff] into a [Chair] which it knew had been previously broken and was held together in numerous places by tape[.]").  Accordingly, the facts Plaintiff alleges are sufficient to raise the inference that the decision to continue to use the Chair constituted deliberated indifference to Plaintiff's well-being.

Accordingly, Plaintiff has satisfied the "shocks the conscience" element.

### iii.  Special Relationship

Defendants concede that Plaintiff has adequately alleged the special relationship element of his state created danger claim.  (Def.'s Mot. at 9 ("This relationship is not in dispute[.]").

Accordingly, Plaintiff has satisfied the the "special relationship" element.

### iv.  Affirmative Act

To satisfy the fourth prong of the state created danger test, Plaintiff must allege that it was the Defendants' "affirmative acts which work[ed] to [his] detriment in terms of exposure to danger.  It is the misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause."  Phillips, 515 F.3d at 235 (quoting Bright, 433 F.3d at 282) (internal quotation marks omitted).  The Third Circuit has "never found a state-created danger claim to be

meritorious without an allegation and subsequent showing that state authority was affirmatively exercised in some fashion." Id. The affirmative act element "is often contested because of the inherent difficulty in drawing a line between an affirmative act and a failure to act. Often times there is no clear line to draw; virtually any action may be characterized as a failure to take some alternative action." L.R., 836 F.3d at 235.

The Third Circuit's discussion of the affirmative act element in L.R. is instructive here. There, a teacher in a Philadelphia school district allowed a kindergarten student to leave his classroom with an adult who failed to identify herself, and the adult proceeded to sexually assault the child. The plaintiff, the child's parent, brought a Section 1983 claim against the teacher and the school district, alleging a violation of the child's substantive due process under the state-created danger doctrine. They argued, "by releasing her daughter to an unidentified adult, [the teacher] created the danger that resulted in [the child's] physical and emotional harm." Id. at 240.

In clarifying the affirmative act requirement, the court reasoned that "[r]ather than approach this inquiry as a choice between an act and an omission, we find it useful to first evaluate the setting or the 'status quo' of the environment before the alleged act or omissions occurred, and then ask whether the state actor's exercise of authority resulted in a departure from the status quo." In that case, the student was "safe in her classroom unless and until her teacher . . . permitted her to leave." Id. Therefore, when the teacher allowed him to leave with an unidentified adult, "he exposed [the child] to a danger she would not have otherwise encountered," thereby deviating from the status quo, and amounting to a culpable misuse of authority. Id.; cf. Morrow, 719 F.3d at 178 (Declining to hold "that a schools' alleged failure to enforce a disciplinary policy is equivalent to an affirmative act under the circumstances here,"

since that would render "every decision by school officials to use or *decline to use* authority, disciplinary or otherwise, would constitute affirmative conduct that may trigger a duty to protect.").

Defendants argue that it is inconsistent with the Complaint for Plaintiff to argue that Defendants' conduct constituted an "affirmative act" rather than a mere failure to act because, in his Complaint, he alleges that "it [wa]s the *failure* to buy a different chair [that] led to the injury, not that complying with the terms of the IEP and taking Plaintiff to the [pool], was the source of the injury."   (Defs.' Mot. at 12 (emphasis added)).

Plaintiff argues, by contrast, that Defendants' "*actions* both of placing [Plaintiff] into what they knew to be a decrepit, taped together, previously broken [Chair] . . . and . . . of improperly taking him out of the collapsing [Chair] were the direct causes of his injuries."  (Pl.'s Opp'n at 13 (emphasis added)).

While "[t]he line between action and inaction may not always be clear," it is clear that physically transporting Plaintiff in the Chair is an "affirmative act."  L.R., 836 F.3d at 240; cf. Morrow, 719 F.3d 160 (school's failure to enforce its own disciplinary policy not an affirmative act; Siles, 456 F.3d at 312 (school's failure to prevent student's suicide was not an affirmative act).  At this point, Plaintiff's allegation that Defendants transported him in the Chair is sufficient to raise the inference that it was Defendants' affirmative act that made Plaintiff vulnerable to danger.  While Defendants may have taken this affirmative act repeatedly—and only once caused injury to Plaintiff—repetition of an action does not transform it into inaction, or the type of "status quo" the court in D.R. suggested might foreclose a plaintiff's claim.  Moreover, whether the culpable event here was Defendants' "act" of transporting Plaintiff in the Chair, or "failure" to replace the Chair it knew to be unsafe, must be determined at a later stage.

For the foregoing reasons, Plaintiff has adequately pled the element of a state-created danger claim, alleged in Count Two of his Complaint.

### C.  Claims Against Guinnane

Defendant argues that all claims against Guinnane, the Superintendent of Lower Merion, must be dismissed because Plaintiff has not alleged that Guinnane had any personal involvement with the events giving rise to Plaintiff's injury, and "has not even pled . . . that [Guinnane] was present on the day he was injured."  (Defs.' Mot. at 10-11).

Plaintiff argues that Guinnane is not liable merely by virtue of his position as the "Superintendent" of Lower Merion.  Rather, Plaintiff argues that he is liable because he is Lower Merion's "Director of Operations" and, pursuant to Lower Merion's "Safety Policy"— which Plaintiff attaches to his brief, but does not reference in his Complaint—"[t]he Director of Operation shall be responsible to correct [all] unsafe conditions."  (Pl.'s Opp'n at 10).

The Court will dismiss all claims against Guinnane because Plaintiff has not adequately alleged claims against him under either the "special relationship" doctrine or the "state-created danger" doctrine.  As for the "special relationship" doctrine, as Defendants argue, Plaintiff does not allege that Guinnane was personally involved in the events that gave rise to Plaintiff's injury. Therefore, the "narrow and unique circumstances" under which Plaintiff will be entitled to pursue his theory of the other defendants' liability under the "special relationship" doctrine does not exist with respect to Guinnane.  Plaintiff has not alleged *any* level of dependence on Guinnane, let alone the level of dependence necessary to warrant an exception to the general rule announced in Morrow, 719 U.S. at 160.

Regarding the "state-created danger" doctrine, Plaintiff has similarly failed to state a claim against Guinnane because Plaintiff has not alleged any "affirmative act" taken by

Guinnane that created a danger to Plaintiff.  Preliminarily, the Court cannot consider Lower

Merion's "Safety Policy"—which Plaintiff attaches for the first time to his Opposition brief—

without converting this motion into one for summary judgment, which it will not do.  See Fed. R.

Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are

presented to and not excluded by the court, the motion must be treated as one for summary

judgment under Rule 56.").   But even if the Court could consider Plaintiff's argument that

Guinnane failed to comply with Lower Merion's "Safety Policy," that allegation, at most,

amounts to a quintessential *failure* to act—as opposed to an "affirmative act"—such that it would

be legally insufficient to satisfy the "state crated danger" doctrine.

Accordingly, all claims against Guinnane will be dismissed without prejudice, and with

leave to amend.

### D.  Monell Claim (Count Three)

Municipal employers, such as Lower Merion, cannot be held vicariously liable for the

constitutional violations committed by their employees.  Monell v. New York City Department

of Social Services, 436 U.S. 658 (1978).  Rather, in order to succeed on a claim of municipal

liability brought pursuant to § 1983, a plaintiff must first identify a municipal policy or custom

that led to the alleged constitutional violation.  The plaintiff must then "'demonstrate that,

through its deliberate conduct, the municipality was the moving force behind the injury

alleged.'"  Berg v. Cnty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (quoting Bd. of Cnty.

Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997)).  If "the policy or custom does not

facially violate federal law, causation can be established only by 'demonstrat[ing] that the

municipal action was taken with deliberate indifference as to its known or obvious

consequences.'" Id. (alteration in original) (quoting Bryan Cnty., 520 U.S. at 407, and citing City of Canton v. Harris, 489 U.S. 378, 389 (1989)).

Deliberate indifference may be established by evidence that policymakers were aware of the constitutional deprivations and of alternatives for preventing them, "'but either deliberately choose not to pursue these alternatives or acquiesced in *a long-standing policy or custom of inaction* in this regard.'" Beck v. City of Pittsburgh, 89 F.3d at 966, 972 (3d Cir. 1996) (quoting Simmons v. City of Philadelphia, 947 F.2d 1042, 1064 (3d Cir. 1991)); see also Bryan Cnty., 520 U.S. at 407 ("If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for.  Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." (citing City of Canton, 489 U.S. at 390 n.10)).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Connick v. Thompson, ——— U.S. ———, 131 S.Ct. 1350, 1359 (2011).  To state a claim against a municipal entity for failure to train, the complaint must allege facts establishing that the municipality's failure to train "amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Id. (quoting City of Canton, 489 U.S. at 388).  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Id. at 1360 (quoting Bryan Cnty., 520 U.S. at 409).

Defendants argue that Plaintiff's allegations against Lower Merion amount to no more than a theory of liability based on *respondeat superior*, and therefore fail to satisfy a Monell claim.  (Defs.' Mot. at 14-16).

Plaintiff acknowledges that municipalities' liability "[cannot] be premised on a theory of vicarious liability," (Pl.'s Opp'n at 16), and argues that he has alleged sufficient facts to support a Monell claim because he alleged that Lower Merion's failure to properly train Sankey and Agostini regarding "use of defective or improper equipment" and the "correct manner to lift him" amounted to deliberate indifference.  (Id. at 16-17 (arguing that "Lower Merion[] . . . knew unsafe equipment and unsafe work practices created a serious risk of harm to students like [Plaintiff], but chose not to properly train [its employees.]")).

Plaintiff has adequately alleged a Monell claim in Count Three of his Complaint.  (See Compl. ¶¶ 71-76).  Plaintiff has alleged that Sankey and Agostini "willfully and consciously ignor[ed] the risks and dangers inherent in repeatedly placing [Plaintiff]" in the Chair by continuously using it "to transport Plaintiff into and out of the pool," despite the fact that its "deplorable condition" was "readily apparent."  (Id. ¶¶ 28, 30, 32, 34).  Plaintiff further alleges that Sankey and Agostini "were not properly trained, or supervised in a manner to allow them to support [Plaintff] once the decrepit [Chair] broke," such that "subsequent inappropriate handling . . . caused [Plaintiff] serious and permanent physical injury."  (Id. ¶¶ 46-47).  This is sufficient to raise an inference that Lower Merion did not properly train Sankey and Agostini to avoid the constitutional violation alleged, and that the continued used of the Chair demonstrated deliberate indifference to Plaintiff's plight because it was a "pattern of similar constitutional violations by untrained employees."  City of Canton, 489 U.S. at 388.

Accordingly, Plaintiff has adequately alleged a <u>Monell</u> claim in Count Three of his Complaint.

### E.  Qualified Immunity

The Supreme Court has held that because qualified immunity shields officers from suit, not just from trial, the district court should "resolve any immunity question at the earliest possible stage of the litigation." <u>Anderson v. Creighton</u>, 483 U.S. 635, 646 n. 6.  However, the Third Circuit has warned that "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." <u>Newland v. Reehorst</u>, 328 F. App'x 788, 791 n. 3 (3d Cir. 2009); <u>see also</u> <u>Garey v. Borough of Quakertown</u>, 2012 WL 3562450, at *3 (E.D. Pa. Aug. 20, 2012) (Baylson, J.).

Although qualified immunity can be a fact-specific inquiry, when the material facts are not in dispute, the district court may decide whether a government official is shielded by qualified immunity as a matter of law.  <u>Orsatti v. New Jersey State Police</u>, 71 F.3d 480, 483 (3d Cir. 1995).  The Supreme Court has outlined a two-step process for determining whether a defendant is entitled to qualified immunity.  First, a court must analyze whether, "[t]aken in the light most favorable to the [plaintiff], . . . the facts alleged show the officer's conduct violated a constitutional right." <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  Second, the court must "ask whether the right was clearly established." <u>Id.</u>  The central inquiry under the second prong is whether it would have been clear to a reasonable officer that their actions were unlawful under the circumstances. <u>Id</u>. at 202.

Defendants argue that "[s]hould it be found that Plaintiff has successfully pled a constitutional violation, Defendants . . . are nonetheless, entitled to qualified immunity" because "it would not be clear to officials in their position that continuing to use equipment that,

according to [P]laintiff, had functioned properly for several years, amounted to a constitutional violation.  (Defs.' Mot. at 13).

Plaintiff argues that Defendants are not entitled to qualified immunity because (1) he has established "that he has viable constitutional claims under both 'special relationship,' and 'state-created danger' theories; and (2) "Defendants should have known that these types of claims would be available to [Plaintiff]" because such theories were announced by the Supreme Court and Third Circuit years ago.  (Pl.'s Opp'n at 15).

Here, the first prong is established, as Plaintiff has alleged Due Process claims pursuant to both the special relationship and state-created danger exceptions.  Regarding the second prong, Defendants may be entitled to qualified immunity from the Section 1983 claims if it would not have been clear to a reasonable person that he had entered into a special relationship with Plaintiff or that he had made Plaintiff more vulnerable to danger.  Taking Plaintiff's allegations as true, at this juncture, this Court is unable to hold that Sankey and Agostini are conclusively entitled to qualified immunity.  They are free to reassert qualified immunity at summary judgment or at trial.

**V.      Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Complaint will be DENIED, except as to all claims against Guinnane, where it will be GRANTED, without prejudice, and with leave to amend.

An appropriate Order follows.

O:\Jessica.2016\16-cv-5366, Lichtenstein v. Lower Merion, et al\Memo Re Motion to Dismiss.docx