**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| MATTHEW LICHTENSTEIN<br><br>        v.<br><br>**LOWER MERION SCHOOL DISTRICT,** et al. | **CIVIL ACTION**<br><br>**NO.  16-5366** |
|---|---|

Baylson, J.                                                          June 28, 2018

### MEMORANDUM RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

#### I. Introduction

At issue in this civil rights case is whether the Court should grant a motion for summary judgment filed by Defendants, Lower Merion School District ("LMSD"), Ryan Sankey ("Sankey"), and Frederick Agostini ("Agostini"), pursuant to Fed. R. Civ. P. 56.  Plaintiff Matthew Lichtenstein ("Lichtenstein"), a special needs student who attended Lower Merion High School ("LMHS"), alleges that his substantive due process rights were violated as a result of injuries he suffered after a chair used to transport him from the LMHS pool collapsed and he was carried into the locker room (the "incident").

For reasons discussed below, the Motion for Summary Judgment will be GRANTED.

#### II. Background

#### A.        Procedural History

This case began on October 13, 2016, with Plaintiff Matthew Lichtenstein filing a Complaint against Defendants Agostini, LMSD, Sankey, and Pat Guinnane ("Guinnane").  (ECF, "Compl.").  The Complaint alleges three counts, all brought pursuant to 42 U.S.C. § 1983.

Count I seeks damages against LMSD for violating the Fourteenth Amendment, based on the "special relationship" exception.  Count II seeks damages against all Defendants for violating

the Fourteenth Amendment, based on the "state-created danger" exception. Count III asserts a <u>Monell</u> claim against LMSD, for failure to properly train or supervise Defendants Agostini and Sankey.

Defendants filed a joint motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6) (ECF 8, "MTD"), which this Court granted in part on February 8, 2017 (ECF 11), in order to dismiss, without prejudice, all claims against Guinnane. Plaintiff thereafter proceeded only on his claims against Agostini, Sankey, and LMSD (hereinafter, "Defendants"). Defendants answered the complaint on March 15, 2017 (ECF 15), and filed their Motion for Summary Judgment on February 28, 2018. (ECF 29, "MSJ"). Defendants also submitted, consistent with this Court's Rules, a "statement of undisputed facts," with twenty-nine attachments as exhibits. (ECF 30, "Def. SOUF"). Plaintiff filed a Response to the Motion on March 14, 2018 (ECF 33, "Response"), together with a "response to statement of undisputed facts," (ECF 33-3, "Pl. Resp. to Def. SOUF") and his own "statement of undisputed facts ("Pl. SOUF"). Defendants then filed a Reply brief in support of the Motion on March 20, 2018 (ECF 36, "Reply"), with three additional exhibits as attachments (ECF 36-1–36-3), as well as a "response to Plaintiff's statement of undisputed facts." (ECF 37, "Def. Resp. to Pl. SOUF"). The Motion for Summary Judgment has been fully and ably briefed for this Court's consideration, and this Court heard oral argument from the parties on June 7, 2018 (ECF 41).[1]

### B. Factual Background

#### 1. Plaintiff Lichtenstein

Plaintiff has cerebral palsy, has been handicapped since birth, and has required the use of a wheelchair since childhood. (Def. SOUF ¶ 3). He also has vision limitations and speech deficits. (<u>Id.</u>). He attended school in the LMSD from kindergarten until the time of the incident

---

[1] The Court also granted leave to the parties to file short letters following oral argument.

on October 16, 2014, although he was frequently absent from school, including the entire 2010-2011 school year. (Id. ¶¶ 4-5).

Due to his multiple disabilities, while a student at Lower Merion, Plaintiff was eligible for special education services pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et. seq. ("IDEA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"). (Compl. ¶ 15). Plaintiff's special education was provided pursuant to an Individualized Education Program ("IEP"). (Id. ¶ 18). During the 2014-2015 schoolyear, Plaintiff's governing IEP provided that he take swimming lessons, and that, while swimming, he would be assisted by two "2:1 assistants." (Def. SOUF ¶¶ 7-8).[2] Sankey and Agostini were the two 1:1 assistants who provided assistance during swimming class for Plaintiff. (Id. ¶ 9).

From December 17, 2013 to January 31, 2014, Plaintiff did not participate in swimming class. (Id. ¶ 27). During the first scheduled session, the heater was shut down and Plaintiff decided not to swim when given the option. (Id.). For all other scheduled swim classes, Plaintiff was either absent or not prepared with his swim suit. (Id.).

In fact, on various occasions after January 31, 2014, Plaintiff chose not to swim or was absent. (Id. ¶ 61). Plaintiff determined how long he swam in the pool. (Id. ¶ 100). There was no order providing that Plaintiff had to swim on October 16, 2014. (Id. ¶ 108). On any day that Plaintiff did not want to swim, Sankey honored Plaintiff's decision not to swim, such that the choice to swim was solely Plaintiff's to make. (Id.). Plaintiff was not forced to attend swimming class. (Id. ¶ 207).

Plaintiff's strengths included advocating for his physical needs. (Id. ¶ 31). Plaintiff was permitted breaks throughout the school day as needed, and when requested by Plaintiff. (Id. ¶ 34). His IEP encouraged Plaintiff to be a self-advocate. (Id. ¶ 38). Plaintiff was never forced to

_____

[2] Plaintiff first participated in swimming at LMHS during the 2013-2014 school year. (Def. SOUF ¶ 10).

take any action at high school. (Id. ¶ 231). Instead, he directed his own care and was an advocate for the positions he took. (Id.).

While in school, the nurse administered medication to Plaintiff, twice daily, pursuant to the protocol issued by Plaintiff's physician. (Id. ¶ 29). LMSD made no medical decisions regarding Plaintiff. (Id. ¶ 230).

Plaintiff was twenty (20) years old at the time of the incident, which is over the compulsory school age required by Pennsylvania statute. (Id. ¶ 1.). See 24 Pa.C.S. §§ 13-1326 and 13-1327.

### 2. The Day of the Incident

On the day of the incident giving rise to this litigation, October 16, 2014, Sankey and Agostini took Plaintiff to the LMHS pool area for swimming class. (Id. ¶ 13). They placed Plaintiff in a chair to transport Plaintiff from the locker room into the pool. (Id. ¶ 14).[3] After Plaintiff's swimming lesson, Sankey and Agostini placed Plaintiff back into the chair to transport Plaintiff from the pool to the locker room. (Id. ¶ 15). While Plaintiff was seated in the chair, the chair broke and either Sankey or Agostini "grabbed" Plaintiff to prevent him from falling onto the pool deck. (Id. ¶ 16). Sankey then carried Plaintiff to the locker room, with Plaintiff under his arms in an upright position. (Id. ¶¶ 18, 106, ECF 30-3 ("incident video").[4] Once in the locker room, Sankey called and informed his supervisor, Bonnie Fox, of the incident. (Id. ¶

---

[3] The chair is the subject of much of this litigation, and further details about it will be provided *infra*.

[4] Plaintiff denies Defendant's SOUF ¶ 106, referring the Court to Defendants' Exhibit 3 (ECF 30-3), a video of the incident which Defendants submitted to the Court. Insofar as the Court refers to the position in which Sankey carried Plaintiff, the Court is relying on the video, which it reviewed as part of its consideration of this motion.

111).[5] Fox recommended that Sankey and Agostini take Plaintiff to the nurse for a professional evaluation, which they did. (Id.).

Right after the incident, Jeremy O'Boyle, a Healthy and Physical Education Teacher at LMHS, asked Plaintiff if he was okay and Plaintiff stated that he was fine. (Id. ¶ 21). On the afternoon of the incident, Christina Costello, a licensed Physical Therapist who works for the LMSD as an independent contractor, encountered Plaintiff and Sankey in the hallway, who informed her about the incident. Costello asked Plaintiff whether he was hurt, and Plaintiff replied, "No." (Id. ¶ 62).[6] Prior to the end of the school day, Plaintiff's mother was notified of the incident. (Id. ¶ 22). Plaintiff returned home at the end of the school day on the school bus. (Id. ¶ 24).

### 3. Plaintiff's Injuries

Although Plaintiff had experienced back pain prior to the incident, he began experiencing pain in his neck on the night of the incident. (Id. ¶¶ 153-154). That night, he could not sleep and his arms were numb. (Id. ¶ 154). He would later experience various serious injuries (Pl. SOUF, Ex. 1-3), which Plaintiff claims arose out of the incident.

### 4. The Chair

Plaintiff was only the third student to use the chair, which was purchased by LMSD around 2000. (Def. SOUF, ¶¶ 45, 59, 240). The chair was intended for use in a shower room to maneuver residents. (Id. ¶ 248). The chair was not intended for use in a pool. (Id.).

---

[5] Plaintiff denies portions of Defendant's SOUF ¶ 111, but admits the two facts for which the Court cites paragraph 111.
[6] Plaintiff "admitted in part and denied in part" this "fact" presented in Defendants' SOUF, stating, "All of the statements . . . are admitted with the exception of the statement that [Plaintiff] was not hurt. [Plaintiff] was injured in the accident." (Pl. Resp. to Def. SOUF, ¶ 62) Thus, it is not disputed that Plaintiff said "no" in response to Costello's question, and Plaintiff points to no evidence showing otherwise.

In September, 2013, Plaintiff was placed into the chair to ensure that it properly supported him. (Id. ¶ 51). Physical Therapist Christina Costello did not detect any issue with the chair at that time, instead determining that the chair was stable. (Id.). The chair was used to transport Plaintiff for all swim classes at Lower Merion High School. (Id. ¶ 139).

Plaintiff's aids, Sankey and Agostini, performed a visual inspection of the chair each time it would be used, prior to placing Plaintiff in the chair. (Id. ¶ 53).

Approximately one or two weeks after the incident, the broken chair was observed with tape on its joints. (Id. ¶ 52). In fact, on the day of the accident, all chair joints were taped, although no witness testified that they knew who placed the tape on the chair joints or why. (Id. ¶¶ 94-95, 227). The tape had been present on the chair for at least several weeks before the incident. (Id. ¶ 97). However, before the incident, no one reported that the chair was dangerous. (Id. ¶ 129).

### III.      Legal Standard

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district

court . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, "by citing to particular parts of materials in the record" set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1)(A). "Speculation and conclusory allegations do not satisfy [the non-moving party's] duty." Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

## IV. Claims Under Section 1983

All of Plaintiff's claims are brought under 42 U.S.C. § 1983. "To establish a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate a violation of a right protected by the Constitution or laws of the United States that was committed by a person acting under the color of state law." Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (en banc) (citing Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996)). "The first step in evaluating a Section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'" Id. (quoting Cty. Of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998)).

## V. Claims Under the Due Process Clause of the Fourteenth Amendment

Counts I and II are Section 1983 claims brought under the Fourteenth Amendment Due Process Clause. Generally, "the due process clause does not impose an affirmative duty upon the state to protect citizens from the acts of private individuals." Sanford v. Siles, 456 F.3d 298, 303-04 (3d Cir. 2006). However, the Third Circuit has recognized two narrow exceptions to that general rule: "[f]irst, the state has a duty to protect or care for individuals when a 'special

relationship' exists"; "[s]econd the state has a duty when a 'state-created danger' is involved." Id. (citing Morse v. Lower Merion School Dist., 132 F.3d 902, 907 (3d Cir. 1997)).

VI.     **Count I – Section 1983 Claim for Violation of the Due Process Clause of the Fourteenth Amendment, "Special Relationship" Exception**

A.     **Parties' Contentions**

In their Motion for Summary Judgment, Defendants assert that Count I, brought against LMSD for an alleged violation of the Due Process Clause of the Fourteenth Amendment under the "special relationship" exception, should be dismissed because: (1) no special relationship existed between Plaintiff and LMHS, and (2) because Plaintiff was past compulsory school age. In any event, Defendants contend that Sankey and Agostini are entitled to qualified immunity.

In his Response, Plaintiff contends that he has demonstrated that the extent of his dependence on LMHS was sufficiently high to come within the circumstances required to state a "special relationship" claim. Moreover, Plaintiff claims that, because the Court found the claim to be adequately alleged for purposes of the Motion to Dismiss, the claim is now barred by the "law of the case" doctrine—which prevents parties from re-litigating issues previously deciding in the same case.

In their Reply, Defendants contend that the "law of the case" doctrine does not apply, such that the fact that Plaintiff was beyond the compulsory school age at the time of the incident is determinative of the "special relationship" claim.

B.     **Applicable Law**

The "special relationship" exception allows a plaintiff to recover when the state enters into a special relationship with a citizen and "fails to protect the health and safety of the citizen to whom it owes an affirmative duty." D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1369 (3d Cir. 1992).

The "special relationship" exception was first recognized in <u>Deshaney v. Winnebago County Dept. of Social Services</u>, 489 U.S. 189, 200 (1989), where the Supreme Court explained that, "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, *or other similar restraints of personal liberty*—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." <u>Id</u>. (emphasis added). Since <u>Deshaney</u>, the Supreme Court has extended this exception to incarcerated individuals, <u>see</u> <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976), and involuntarily committed mental patients, <u>see</u> <u>Youngberg v. Romeo</u>, 457 U.S. 307 (1982), and the Third Circuit has extended it to foster children, <u>see</u> <u>Morra</u>, 212 F.3d at 801.

The Third Circuit took up the issue of whether the special relationship exception should be extended in the public school district context in <u>Middle Bucks</u>, 972 F.2d at 1369. There, two female students alleged that they had been verbally and sexually molested by male students in an art class. They argued that, under <u>Deshaney</u>, the special relationship exception should apply because their relationship with the school was a type of "restraint[] of personal liberty" that was analogous to the custodial relationships where the exception had been conclusively recognized. The court held, however, that the "type of custody referred to by the Court in <u>Deshaney</u> . . . [wa]s to be sharply contrasted with [the plaintiff's] situation." <u>Id</u>. Specifically, it explained,

> "[t]he state's duty to prisoners and involuntarily committed patients exists because of the full time severe and continuous state restrictions of liberty in both environments. Institutionalized persons are wholly dependent upon the state for food, shelter, clothing and safety. It is not within their power to provide for themselves, nor are they given the opportunity to seek outside help to meet basic needs. Obviously, they are not free to leave."

Id. at 1371. The Third Circuit rejected the plaintiff's argument that the school's authority over the plaintiffs during the school day, or the fact that state law compels their attendance, brings them within the exception because "students . . . do not depend upon the schools to provide for their basic human needs . . . even during the school day . . . parents or others remain a child's primary caretakers and decisionmakers." Id. at 1372.

Then, in Morrow v. Balaski, 719 U.S. F.3d 160 (3d Cir. 2013), citing *dictum* in Vernonia School District 47J v. Acton, 515 U.S. 646 (1995),[7] the Third Circuit officially rejected the notion that "public schools *as a general matter* have such a degree of control over children as to give rise to a constitutional 'duty to protect'" them from private actors. Id. (citing DeShaney, 489 U.S. at 200) (emphasis added). The Third Circuit, however, left the door for such claims slightly ajar. The court explained,

> [W]e do not foreclose the possibility of a special relationship arising between a *particular* school and a *particular* student under certain unique and narrow circumstances. However, any such circumstances must be so significant as to forge a different kind of relationship between a student and a school than that which is inherent in the discretion afforded school administration as part of the schools' . . . compulsory attendance laws.

Id. (emphasis in original).

In reaching its conclusion, the court reiterated the rationale articulated in Middle Bucks that, "unlike children in foster care, students in public schools continue to be primarily dependent on their parents for their care and protection, not on their school." That is, "the restrictions that schools place on students generally, and the specific restrictions alleged here, are different in kind from the restrictions faced by the prisoners at issue in Estelle or institutionalized persons in Youngberg." Id. (internal citations omitted).

_____

[7] In Vernonia, the Supreme Court stated, "[W]e do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional 'duty to protect.'" 515 U.S. at 655.

## C.    Analysis

This Court previously held at the Motion to Dismiss stage that:

> Plaintiff ha[d] **adequately alleged** that the extent of his dependence on the Defendants, while being transported in the Chair, was at least as high as the extent of, *e.g.*, an inmate's dependence in prison.   Accordingly, the Court may reasonably draw the inference that his claim comes within the "unique and narrow circumstances" required to successfully state a "special relationship" claim.

(ECF 10, "MTD," at 9 (emphasis added)).

In no way did the Court's ruling as to the sufficiency of Plaintiff's allegations foreclose this Court, pursuant to the "law of the case doctrine" or otherwise, from viewing the undisputed facts at the summary judgment stage to determine whether, with the benefit of discovery and a distinct legal standard, Plaintiff has failed to meet his burden as a matter of law.   In fact, the Court specifically left open this possibility, stating that "Plaintiff is a prisoner to his own body, not one of the State," and that "this nuance may be relevant at some later stage."   (MTD, at 9). We have now reached that "later stage."

Plaintiff was beyond the compulsory school age at the time of the incident, and thus cannot be likened to the prisoners in Estelle or the institutionalized persons in Youngsberg.   He attended school by choice, receiving medical and other care pursuant to an IEP which allowed him the independence to make choices about whether to engage in certain activities such as swimming.   Indeed, to the extent that Plaintiff was a "prisoner" at all, it was not to the school but rather his own physical limitations.   While it is true that during the school day, Plaintiff relied on aides for many of his needs, he remained an adult free from any state imposed restriction.   He could simply decide that he would not go to the state institution (school) on any given day (or ever again), unlike prisoners, foster children, or institutionalized persons, all of whom could not freely choose whether to interact with state actors.   Much like the situation at issue in Middle

<u>Bucks</u>, "parents or others remain [Plaintiff's] primary caretakers and decisionmakers." 972 F.2d at 1372.

Therefore, given the undisputed material evidence in this case, as a matter of law, Plaintiff cannot be said to be in a "special relationship" with the state.

**VII.     Count II – Section 1983 Claim for Violation of the Due Process Clause of the Fourteenth Amendment, "State-Created Danger" Exception**

      **A.     Applicable Law**

In <u>Kniepp v. Tedder</u>, 95 F.3d 1199, 1201 (3d Cir. 1996), the Third Circuit adopted the state created danger theory as a mechanism by which plaintiffs may establish constitutional violations, under Section 1983, if an individual incurs harm as a direct result of certain state actions. In other words, "liability may attach where the state acts to *create* or *enhance* a danger that deprives a plaintiff of his or her Fourteenth Amendment rights to substantive due process." <u>Morrow</u>, 719 F.3d at 177 (emphasis in original).

In <u>Bright v. Westmoreland Cty.</u>, 443 F.3d 276 (3d Cir. 2006), the Third Circuit articulated the following four-factor test to determine whether a plaintiff has stated a claim under the state-created danger exception:

> (1) The harm ultimately caused was foreseeable and fairly direct;
>
> (2) A state actor acted with a degree of culpability that shocks the conscience;
>
> (3) A relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) A state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

<u>Id</u>. at 281.

## 1. First Element - The harm ultimately caused was foreseeable and fairly direct

Defendants contend that they had no knowledge of any issues with the chair that broke. Plaintiff asserts, on the other hand, that the presence of tape on the chair created foreseeability of harm. In their Reply, Defendants counter that no witness stated they had even a suspicion that the chair was broken or required repair, especially because the chair had been used without incident for a measurable period of time.

### a) Applicable Law

Both parties agree that to establish foreseeability, Plaintiff must prove "awareness on the part of the state actors that rises to level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." <u>Phillips v. Cty. of Allegheny</u>, 515 F.3d 224, 238 (3d Cir. 2008).

### b) Analysis

Defendants Sankey and Agostini both testified at depositions that broken equipment should not be used. (Def. SOUF, ¶¶ 109, 150). Moreover, Defendant Sankey testified that he saw tape on the chair prior to the incident, (<u>Id.</u>, ¶¶ 94-95), from which it could potentially be inferred that he should have known of the risk of placing Plaintiff in the chair. However, this risk was not "sufficiently concrete" to put Defendants on notice of the harm, because the chair had been used without incident since 2000, including during the months leading up to the incident in which the chair collapsed. Thus, there are no material facts still in dispute with respect to whether Defendants were aware of a risk that put them on notice of the harm Plaintiff eventually suffered.

## 2. Second Element - A state actor acted with a degree of culpability that shocks the conscience

Defendants assert that their level of wrongfulness rose only to the level of negligence, which is insufficient, given the fact that the relevant decisions were made in a hyperpressurized situation. Plaintiff claims that the situation was not hyperpressurized but rather the product of a series of deliberate decisions made over time. Moreover, Plaintiff claims that Defendant Sankey's decision to carry Plaintiff to the locker room without using a two-man transfer shocks the conscience, as does Defendants' decision to use a chair that was taped—thereby indicating that it was not sturdy or safe. In their Reply, Defendants contend that the situation was in fact hyperpressurized because Agostini and Sankey had little time to react to the incident, such that Plaintiff should be required to show an intent to cause harm in order to demonstrate sufficient culpability for this element of the claim.

### a) Applicable Law

To satisfy the second element of the state-created danger claim, Plaintiff must show that the Defendants' acts "shock the conscience" of the Court. <u>Phillips</u>, 515 F. 3d at 240; <u>Sanford v. Stiles</u>, 456 F. 3d 298, 204 (3d Cir. 2006). "[T]he exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case, and depends in particular on 'the extent to which a state actor is required to act under pressure.'" <u>Walter v. Pike Cnty., P.A.</u>, 544 F. 3d 182, 192 (3d Cir. 2008) (citations omitted). In a "hyperpressurized environment," an intent to cause harm is usually required while "in cases where deliberation is possible and officials have some time to make 'unhurried judgments,' deliberate indifference is sufficient." <u>Id.</u> Under circumstances involving something less than urgent than a "split second" decision, but more urgent than "unhurried judgment," there is a mid-level standard that requires gross negligence and arbitrariness—the state actor must 'consciously

disregard a great risk of serious harm.'" Id. at 192-93 (citation omitted). This prong is a high threshold to satisfy and will often decide the case. Sanford, 456 F. 3d at 305. Furthermore, "mere negligence is not enough to shock the conscience." County of Sacramento v. Lewis, 523 U.S. 833 (1998).

In Sanford, the Third Circuit clarified "the standard of fault in state-created danger cases." 456 F.3d at 305. As the court explained, "[i]n any state-created danger cases, the state actor's behavior must always shock the conscience. But what is required to meet the conscience-shocking level will depend upon the circumstances of each case, particularly the extent to which deliberation is possible." Establishing what has become known as a "spectrum of culpable conduct," Kaucher, 455 F.3d at 426, the Stiles court elaborated that "the level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases." 456 F.3d at 309.

There are essentially three possible tests for conscience-shocking culpability, depending on the amount of time a defendant has to deliberate before acting:

(1) "**In a hyperpressurized environment**, an intent to cause harm is usually required."

(2) "[W]hen a state actor is **not confronted with a hyperpressurized environment but nonetheless does not have the luxury of proceeding in a deliberate fashion**, the relevant question is whether the officer consciously disregarded a great risk of harm."

(3) "[I]n cases **where deliberation is possible** and officials have the time to make unhurried judgments, deliberate indifference is sufficient."

Id. at 309-310.

With respect to the third situation, where there is ample time for deliberation and thus the "deliberate indifference" test is used, the court noted that "deliberate indifference might exist

without actual knowledge of a risk of harm when the risk is so obvious that it should be known." Id. at 310.

### b) Analysis

Based on the facts presented in the light most favorable to Plaintiff, this Court finds that the decision to use the chair was one for which there was ample time for deliberation. However, the decision to carry Plaintiff without using a two-man transfer after the chair broke was one made by state actors in a hyperpressurized situation, or, at the very least, one in which there was no luxury of proceeding in a deliberate fashion.

With respect to the latter decision, made without the benefit of deliberation, Plaintiff has presented no evidence from which a jury could infer that any Defendant consciously disregarded a great risk of harm. The presence of tape on the chair falls far short of what is legally required to show such conscious disregard. Therefore, there was undoubtedly no violation of Plaintiff's constitutional rights arising out of the failure of Defendants to use a two-man transfer after the chair broke.

As for the decision to use the chair to transfer Plaintiff into and out of the pool, the Court employs the "deliberate indifference" standard, such that the necessarily level of culpability "might exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known." Id. at 310. The only evidence favoring Plaintiff on this point is:

 (1) Testimony from the chair manufacturer's corporate designee stating that the chair in question was not designed or manufactured to be a transport or pool chair.

 (2) The presence of tape on the chair prior to the incident; and

 (3) The fact that as a result of Plaintiff's cerebral palsy, Defendants knew he was especially susceptible to injury.

These pieces of evidence are insufficient to rise to the level of "deliberate indifference." Plaintiff has presented no evidence that Defendants were not on actual notice that the chair was

manufactured for a purpose other than for transporting Plaintiff to and from the pool. As stated above, the mere presence of tape is similarly insufficient (even in tandem with knowledge of Plaintiff's physical disability), as the chair had been used for years prior to the incident without any issue.

As a matter of law, Defendants' actions cannot be said to have "shocked the conscience" under any of the above tests. If this were a negligence case, summary judgment might be inappropriate. However, this is a case about constitutional harm, and the narrow "state-created danger" exception requires a substantially more searching, "conscience-shocking" analysis. Plaintiff falls far short of meeting that standard.

### 3. Third Element - Plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions

Defendants do not make any arguments that Plaintiff has failed to meet his burden as to the third element. Therefore, Defendants have conceded, as they did at the Rule 12 stage, that the third element is fulfilled.

### 4. Fourth Element - A state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all

Defendants claim that it was a failure to act, rather than an affirmative act, which allegedly caused harm to Plaintiff. Plaintiff asserts that he has established affirmative action on the part of Defendants because Plaintiff was safe prior to the actions of the relevant state actors, but injured after they took action, without any intervening action by third-parties.

### a) Applicable Law

To satisfy the fourth prong of the state created danger test, Plaintiff must show that it was the Defendants' "affirmative acts which work[ed] to [his] detriment in terms of exposure to danger. It is the misuse of state authority, rather than a failure to use it, that can violate the Due

Process Clause." Phillips, 515 F.3d at 235 (quoting Bright, 433 F.3d at 282) (internal quotation marks omitted). The Third Circuit has "never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised in some fashion." Id. The affirmative act element "is often contested because of the inherent difficulty in drawing a line between an affirmative act and a failure to act. Often times there is no clear line to draw; virtually any action may be characterized as a failure to take some alternative action." L.R. v. Sch. Dist. of Philadelphia, 836 F.3d 235, 242 (3d Cir. 2016).

The Third Circuit's discussion of the affirmative act element in L.R. is instructive here. There, a teacher in a Philadelphia school district allowed a kindergarten student to leave his classroom with an adult who failed to identify herself, and the adult proceeded to sexually assault the child. The plaintiff, the child's parent, brought a Section 1983 claim against the teacher and the school district, alleging a violation of the child's substantive due process under the state-created danger doctrine. They argued, "by releasing her daughter to an unidentified adult, [the teacher] created the danger that resulted in [the child's] physical and emotional harm." Id. at 240.

In clarifying the affirmative act requirement, the court reasoned that "[r]ather than approach this inquiry as a choice between an act and an omission, we find it useful to first evaluate the setting or the 'status quo' of the environment before the alleged act or omissions occurred, and then ask whether the state actor's exercise of authority resulted in a departure from the status quo." In that case, the student was "safe in her classroom unless and until her teacher . . . permitted her to leave." Id. Therefore, when the teacher allowed him to leave with an unidentified adult, "he exposed [the child] to a danger she would not have otherwise encountered," thereby deviating from the status quo, and amounting to a culpable misuse of

authority.  Id.; cf. Morrow, 719 F.3d at 178 (Declining to hold "that a schools' alleged failure to enforce a disciplinary policy is equivalent to an affirmative act under the circumstances here," since that would mean that "every decision by school officials to use or *decline to use* authority, disciplinary or otherwise, would constitute affirmative conduct that may trigger a duty to protect.").

### b) Analysis

Defendants' decision—to use a chair which (if Plaintiff's evidence is believed) was designed and manufactured for purposes other than as a pool or transfer chair—was an affirmative act which placed Plaintiff in greater danger than the "status quo."  Therefore, although Plaintiff has failed to meet the required burden on other elements of the four-prong analysis, this element is satisfied for purposes of Defendants' Rule 56 motion.

## VIII.    Qualified Immunity

Defendants Sankey and Agostini contend that they are entitled to qualified immunity, a species of "good faith" defense available to individual state actors sued under 42 U.S.C. § 1983. Having held that Defendants did not commit any constitutional wrong, the below analysis is an alternative holding.

### A. Applicable Law

For decades, the Supreme Court has held that "the doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  See also Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) (stating that "[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly

established at the time of the challenged conduct").  The Supreme Court has explained that qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  In Pearson, the Supreme Court explained that "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  555 U.S. at 231.

The Supreme Court has described the test for qualified immunity as a "two-pronged inquiry."  Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014).  The first prong concerns whether the "conduct" of a government official "violated a [federal] right [.]"  Id. (alteration original).  "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation."  Id. at 1866.  Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis" to tackle first. Pearson, 555 U.S. at 236.

Defendants asserting a qualified immunity defense typically first argue that they committed no constitutional violation, and then argue that even if they had violated the constitution, they are entitled to qualified immunity because the right asserted was not clearly established.  See, e.g., Plumhoff v. Rickard, 134 S. Ct. 2012 (2014) (accepting police officers' alternative arguments that a fatal shooting after a high-speed chase did not constitute excessive use of force in violation of the Fourth Amendment and even if it had, the officers would have been entitled to qualified immunity).

The Supreme Court has further clarified that a "clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right" such that "existing precedent must have placed the statutory or constitutional question beyond debate." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (internal quotations and citations omitted) (warning courts "not to define clearly established law at a high level of generality"). "The dispositive question is whether the violative nature of *particular* conduct is clearly established," an inquiry that "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. (finding that police officer in excessive use of force case was entitled to qualified immunity where the shooting took place against a "hazy legal backdrop"). Courts are to consider the state of the law at the time of the violation; "later decided cases [can]…not give fair notice" to a defendant as to the illegality of his conduct. Plumhoff, 134 S. Ct. at 2023 (reviewing case law prior to date of alleged excessive use of force and declining to consider subsequent cases). In this way, the Third Circuit has described qualified immunity analysis as "look[ing] through the rearview mirror, not the windshield." Williams v. Sec'y Pennsylvania Dep't of Corr., 848 F.3d 549, 570 (3d Cir. 2017) (defendants were entitled to qualified immunity where right asserted was not clearly established at the time of the alleged violations in the lawsuit, but had become clearly established by the time of the Third Circuit's decision).

When evaluating claims that the right asserted was clearly established, courts in the Third Circuit "look first for applicable Supreme Court precedent," but "[i]f none exists," courts then "consider whether there is a case of controlling authority in our jurisdiction or a robust consensus of cases of persuasive authority in the Courts of Appeals [that] could clearly establish a right for purposes of qualified immunity." Barna v. Bd. of Sch. Directors of Panther

Valley Sch. Dist., 877 F.3d 136, 142 (3d Cir. 2017) (quotations and citations omitted) (members of school board who banned disruptive meeting participant were entitled to qualified immunity where "given the state of the law at the time of the Board's ban there was, at best, disagreement in the Courts of Appeals as to the existence of a clearly established right to participate in school board meetings despite engaging in a pattern of threatening and disruptive behavior").

Thus, at the summary judgment stage, if the right asserted is not clearly established, it is possible for a defendant to be entitled to qualified immunity—and to a grant of summary judgment—even if there is a factual dispute as to whether the defendant's conduct violated constitutional rights.  Such was the case in this Court's decision in Bradley v. W. Chester Univ. of Pennsylvania State Sys. of Higher Educ., 226 F. Supp. 3d 435 (E.D. Pa. 2017), aff'd on other grounds, 880 F.3d 643 (3d Cir. 2018).

### B.  Analysis

In the present case, it is clear that the individual defendants were not on notice of a clearly established constitutional right.  Neither the special relationship theory nor the state-created danger theory has prevailed in a sufficiently similar context so as to provide notice of the alleged constitutional harm at issue here.

The closest Third Circuit case in the special relationship context, discussed *supra*, is Middle Bucks, in which the Court declined to extend the special relationship exception to the public school context in general.  See also Morrow v. Balaski, 719 F.3d 160 (3d Cir. 2013).  This, of course, reinforces that Sankey and Agostini were not on notice of the possibility that they could be subject to a special relationship claim.  Moreover, nothing indicates that the individual defendants "should have known" that a special relationship theory could extend to their interactions with Plaintiff, because Plaintiff could generally choose which activities from

his IEP, including swim classes, he would perform each school day (or whether he would attend school at all).

As for the state-created danger theory, Defendants also cannot be said to have been "on notice" that they could be subject to such a claim. This case is entirely unlike L.R., discussed extensively *supra*.[8]

### IX. Count III – Monell Claim Against LMSD for Failure to Properly Train and/or Supervise Defendants Sankey and Agostini

Having held that no underlying constitutional harm occurred, Plaintiff's Monell claim must also be dismissed.

### X. Conclusion

Defendants' Motion for Summary Judgment (ECF 29) is hereby GRANTED. An appropriate order follows.

O:\CIVIL 16\16-5366 Lichtenstein v Lower Merion Sch Dist\Memo re MSJ.docx

---

[8] At oral argument, Plaintiff sought support from Mann v. Palmerton Area Sch. Dist., 872 F.3d 165 (3d Cir. 2017). However, Mann cannot be a source of support for Plaintiff regarding qualified immunity, because the opinion was filed nearly three years after the October 16, 2014 incident at issue in this case. To the extent that post-dated appellate caselaw can be used to determine the state of the law when the event at issue occurred, Kedra v. Schroeter, 876 F.3d 424, 442 (3d Cir. 2017), cert. denied, No. 17-1204, 2018 WL 1091448 (U.S. May 14, 2018), a simple review of Mann demonstrates that it is not "illustrative of the proper application" of a previously established constitutional principle, which is the limited purpose for which post-dated appellate caselaw should be considered. See Wiggins v. Smith, 539 U.S. 510, 522 (2003).